**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**ZIPORA MAZENGO**,

     Plaintiff,

    v.

**ALAN S. MZENGI, et al.,**

     Defendants.

Civil Action No. 07-756 (RMC)(AK)

**REPORT AND RECOMMENDATION**

     United States District Judge Rosemary M. Collyer referred this matter to the undersigned pursuant to Local Civil Rule 72.3(a) to conduct a hearing and issue a Report and Recommendation on damages.  (Order dated 10/1/07 [15] at 2.)  After considering the evidence presented at the hearing on December 10, 2007, the undersigned issues the following Report and Recommendation as to the amount of damages that the trial court should order Defendant Stella Mzengi to pay Plaintiff Zipora Mazengo.

**I.     BACKGROUND**

     A.     Procedural History

     On April 25, 2007, Ms. Mazengo filed a Complaint against Alan and Stella Mzengi alleging violations of the Thirteenth Amendment to the United States Constitution and its enabling statute (18 U.S.C. § 1584), the trafficking and forced labor provisions of the Trafficking

1

Victims Protection Act of 2000 (18 U.S.C. §§ 1590, 1595, 1589), the minimum wage and

overtime provisions of the Fair Labor Standards Act (29 U.S.C. §§ 201-209) and the Maryland

Wage and Hour Law (MD. CODE ANN., LAB. & EMPL. § 3-401, *et seq.*). (Compl. [1] at 12-16.)

The Complaint also set forth allegations of fraudulent inducement, unjust enrichment, breach of

contract, and negligent infliction of emotional distress. (*Id.* at 17-20.)

      Mr. Mzengi was personally served with the complaint and summons, and accepted

service of the same on behalf of his wife, on April 26, 2007. (Aff. [6] at 2; Aff. [7] at 2.) When

Defendants failed to answer the Complaint within twenty days, Ms. Mazengo requested that the

Clerk enter default. (Aff. for Default [10].) The Clerk of Court entered default on June 5, 2007.

(Entry of Default [11].) On June 22, 2007, Ms. Mazengo moved the trial court for an entry of

default judgment against Defendants and for a hearing to assess damages, attorneys' fees and

costs. (Mot. for Default J. [13].) Judge Collyer ordered Defendants to show cause by September

14, 2007 why Plaintiff's Motion for Default Judgment should not be granted. (Order dated

8/15/07.) Defendants did not respond and on October 1, 2007, Judge Collyer granted Plaintiff's

Motion for Default Judgment and referred the case to the undersigned to conduct a hearing and

issue a report and recommendation on damages. (Order dated 10/1/07 [15].)

      On December 6, 2007, Defendant Alan Mzengi retained an attorney, Samuel Omwenga.

(Def.'s Mot. to Continue Hr'g ¶ 1.) The following day, Mr. Omwenga filed a motion to continue

the damages hearing, which several weeks earlier had been set for December 10, 2007. Mr.

Omwenga indicated that he intended to seek relief from the default judgment entered against his

client by filing a motion under Federal Rule of Civil Procedure 60(b)(1). (*Id.* ¶ 5.) Plaintiff

opposed this Motion and argued that even if the hearing was to be continued as to Defendant

Alan Mzengi it should not be continued as to Stella Mzengi.  (Pl.'s Opp'n ¶ 3.)

The damages hearing as to Defendant Stella Mzengi was held on December 10, 2007. Plaintiff testified about the circumstances under which she came to work for Defendants in 2000, the working and living conditions while she was in their home, and her departure from their employment in 2004.  Gary Ray, an analyst with the State of Utah, Department of Technology Services, testified as an expert witness regarding the prevailing wage for the services Plaintiff provided in the geographical area in which she worked.


B.    Facts

On June 12, 2000, Alan Mzengi and Zipora Mazengo entered into an employment contract under which Ms. Mazengo would perform "child care and normal household work" at the Mzengis' Bethesda, Maryland home and be compensated at a rate of $900 per month.[1]  (Pl.'s Ex. 1 ¶¶ 1, 9; Tr. at 14.)  The contract provided that Ms. Mazengo would "work eight hours a day, five days a week" and receive overtime compensation "at the rate of 1.5 times the rate for regular days."  (Pl.'s Ex. 1 ¶ 2; Tr. at 14)  The contract further provided that Ms. Mazengo would "get two full days off per week" and two weeks of paid vacation per year and that she would be "free to leave the [Mzengis' house] at all times other than regular or overtime working hours." (Pl.'s Ex. 1 ¶¶ 3, 4; Tr. at 14-15)  Finally, the contract obligated the Mzengis to pay the employer's portion of social security taxes.  (Pl.'s Ex. 1 ¶ 9; Tr. at 15)  Mr.  Mzengi used this employment contract to procure an A-3 visa for Ms. Mazengo.  (Compl. ¶ 22.)

---

[1] The terms of the contract indicate that it is between "Mr. & Mrs. Mzengi" as employer and Ms. Mazengo as employee, but the contract is only signed by Mr. Mzengi and Ms. Mazengo.  (Pl.'s Ex. 1.)

At the time the contract was executed, Ms. Mazengo was twenty years old and doing domestic work in Dar-es-Salaam, the capital of Tanzania.  (Compl. ¶ 11, 14.)  Defendants were living in the United States where Mr. Mzengi held the position of Minister-Counselor at the Embassy of Tanzania in Washington, D.C.[2]  (*Id.* ¶ 13.)  The employment contract was Ms. Mazengo's first experience with a written contract for employment and had to be read to her in Swahili because it was written in English and, at the time, Ms. Mazengo did not speak English. (*Id.* ¶ 17-18.)  Ms. Mazengo believed that the Mzengis would honor the employment contract and relied on the promises the Mzengis made in the contract when she signed the contract on June 12, 2000 and agreed to travel to the United States to work for the Mzengis.  (Tr. at 16.)

Ms. Mazengo arrived in the United States on June 27, 2000 (Compl. ¶ 24.)  Before she even left the airport, Mr. Mzengi seized her passport and her copy of the employment contract. (*Id.* ¶ 58; Tr. at 16.)  Ms. Mazengo began to work for the Mzengis immediately after her arrival. (Compl. ¶ 24; Tr. at 18.)  Her conditions of employment over the next four years varied greatly from those promised in the employment contract.  Instead of working eight hours per day, five days per week, Ms. Mazengo routinely labored from six o'clock in the morning until eleven o'clock in the evening, seven days per week.  (Tr. at 18-19.)  Ms. Mazengo took care of the Mzengis' three children, preparing their meals, getting them ready for school, and looking after

---

[2] Article 31 of the Vienna Convention on Diplomatic Relations provides that a diplomat enjoys immunity from the civil jurisdiction of the receiving State.  Even if Ms. Mzengi would also be immune from the civil jurisdiction of the United States because she is the wife of a diplomat, she has not appeared in this litigation to assert such immunity.  Additionally, diplomatic immunity is not absolute.  Of relevance to this case, Article 31(c) provides that a diplomatic agent does not enjoy immunity from civil jurisdiction in "[a]n action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving state outside his official functions."  Because the Mzengis operated a catering business, which is clearly not part of the official functions for which the government of Tanzania sent Mr. Mzengi to this county, it is arguable that the Mzengis would not be immune from civil jurisdiction in an action that relates to Ms. Mazengo's work for the catering company.  However, Ms. Mzengi has not raised diplomatic immunity as a defense and therefore it is not an issue before the undersigned or the trial court.

4

them until they went to bed at night.  (Compl. ¶ 27.)  Ms. Mazengo slept in the same room as the

Mzengis' infant child and took care of the child during the night.  (Tr. at 19-20.)  In addition to

looking after the children, Ms. Mazengo was responsible for cleaning the Mzengis' six bedroom,

four bathroom house , cooking meals for the family, washing the dishes, and performing other

chores such as raking leaves and shoveling snow.  (Compl.  ¶ 27.)  Ms. Mazengo also prepared

food for a catering business that the Mzengis operated out of their home.  (*Id*. ¶ 34; Tr. at 24.)

        The Mzengis mistreated Ms. Mazengo throughout the four years that she worked in their

home.  Ms. Mzengi would yell at her and on one occasion struck Ms. Mazengo on the face for

not preparing Ms. Mzengi's breakfast on time.  (*Id*. ¶ 53; Tr. at 21.)  Immediately following this

incident, Ms. Mzengi sent Ms. Mazengo outside in the cold January temperatures even though

Ms. Mazengo was only wearing a short-sleeved shirt and shorts.  (Compl. ¶ 53; Tr. at 21-22.)

When Ms. Mazengo reported this to Mr. Mzengi, Ms. Mzengi became angry and warned that

"somebody is going to bleed in the house" if Ms. Mazengo complained again.  (Tr. at 23.)

Throughout these four years, the Mzengis isolated Ms. Mazengo and refused to permit her to

leave the house unattended or have friends or visitors.  (Compl. ¶ 47; Tr. at 23, 28.)  The

Mzengis also refused to allow Ms. Mazengo to return to Tanzania when her sister was dying.

(Compl. ¶ 63; Tr. at 34-35.)

        The Mzengis also neglected Ms. Mazengo's medical needs.  (Compl. ¶ 60; Tr. at 25.)

Ms. Mazengo suffered from ingrown toenails that made it painful for her to walk or wear shoes.

(Compl. ¶ 62; Tr. at 25)  The Mzengis were aware of her conditions but forced her to perform

outdoor chores, such as shoveling snow, even though she could not wear shoes.  (Tr. at 26-27.)  It

was three years before the Mzengis took her to a doctor, at which time the doctor informed Ms.

Mazengo that if she had waited any longer to seek medical treatment she might have lost her toes. (*Id*. at 30.) Ms. Mazengo needed surgery to fix her condition and her doctor told her to stay off her feet. (*Id*. at 31.) Despite this advice, the Mzengis put to her to work on the same day that she had surgery. (*Id*.)

In August 2004, after Ms. Mazengo's sister died, Mr. Mzengi purchased a one-way airplane ticket for Ms. Mazengo to return to Tanzania and gave Ms. Mazengo her passport. (Compl. ¶ 64; Tr. at 29.) Ms. Mazengo was not prepared to return to Tanzania, however, until she received the wages that she was due and that the Mzengis refused to pay. (Compl. ¶ 67-68.) Ms. Mazengo confided in a customer of the Mzengis' catering business about her situation. (Compl. ¶ 69; Tr. at 32.) This individual sent a taxi for Ms. Mazengo so that she could leave the Mzengis' house. (Compl. ¶ 69; Tr. at 33.)

The Mzengis have not paid Ms. Mazengo for any of the work she performed for their benefit between June 2000 and August 2004. (Compl. ¶ 40.) Since her escape, she has suffered from insomnia, an inability to eat, depression, and headaches. (Tr. at 36.) She was not immediately able to work or take care of herself. (*Id*. at 36-37.) Ms. Mazengo fears for her life and the lives of her family members in Tanzania because of threats they have received from the Mzengis. (*Id*. at 37-38.) Ms. Mazengo maintains that if it were safe to do so she would return to Tanzania to be with her family. (*Id*.)

6

## II.  ANALYSIS

### A.  Damages for Unpaid Wages[3]

The Maryland Wage and Hour Law, MD. CODE ANN., LAB. & EMPL. § 3-401, *et seq*.,
governs the calculation of Plaintiff's damages for unpaid wages and overtime compensation.  At
all times relevant to this action, the Wage and Hour Law required that an employer pay his
employee a minimum wage that was at least equal to that provided for under the federal Fair
Labor Standards Act (FLSA).  MD. CODE ANN., LAB. & EMPL. § 3-413(b)(1).[4]  The minimum
wage under the FLSA during the time that Plaintiff worked for Defendants was $5.15 per hour.
29 U.S.C. § 206 (prior to 2007 Amendments).  The Wage and Hour Law further provides that an
employer must pay an overtime wage of at least one and one half times the applicable hourly
wage for each hour over forty hours that an employee works during one workweek.  MD. CODE
ANN., LAB. & EMPL. §§ 3-415(a), 3-420(a).  Therefore the rate for Plaintiff's overtime
compensation is $7.73 per hour.

Both the Wage and Hour Law and the Wage Payment and Collection Law provide an

---

[3] Recovery for unpaid wages is available under both the federal Fair Labor Standards Act and Maryland's
Wage and Hour Law.  Choice of law is a substantive issue under the *Erie* doctrine.  *Keene Corp. v. Ins. Co. of N.
Am.*, 597 F.Supp. 934, 937 (D.D.C. 1984).  Therefore to determine whether federal or state law applies in this
diversity action, the court must apply the choice of law rules of the forum state, the District of Columbia.  *Id.*  The
District of Columbia uses the "interest analysis" approach, which focuses on "the relationship of the jurisdictions to
the controversy, the interests involved, and whether application of foreign law would offend a strong and clearly
defined local policy."  *Mazza v. Mazza*, 475 F.2d 385, 391 (D.C. Cir. 1973).  Stated differently, the court should
apply the law of the jurisdiction that has the greatest connection to the facts that gave rise to the litigation.  *See, e.g.*
*Vaughn v. Nationwide Mut. Ins. Co.*, 702 A.2d 198, 202-03 (D.C. 1997) (weighing the respective interests of
Maryland and the District of Columbia in determining which jurisdiction's law applies).  In this case, Ms. Mazengo
labored for four years at the Mzengis' home, first in Bethesda, Maryland and later in Gaithersburg, Maryland.
(Compl. ¶ 9.)  Therefore Maryland is the jurisdiction with the greatest interest in this litigation and the Maryland
Wage and Hour Law should govern Ms. Mazengo's recovery of unpaid wages.

[4] In 2006, this section was amended to provide that employers must pay at least the greater of the federal
minimum wage and $6.15 per hour.  Because Plaintiff worked for Defendants from 2000 until 2004, however, the
amended version of the Wage and Hour Law does not apply.

employee with a private right of action against and employer who fails to pay the required hourly wage or overtime compensation. MD. CODE ANN., LAB. & EMPL. §§ 3-427(a), 3-507.1(a). If a court finds that an employer withheld the wages "not as a result of a bona fide dispute," the plaintiff is entitled to recover treble damages. MD. CODE ANN., LAB. & EMPL. § 3-507.1(b). *But see Imgarten v. Bellboy Corp.*, 383 F.Supp.2d 825, (D. Md. 2005) (noting that the treble damages provision caps the employee's award at three times the unpaid wage and "does not authorize treble damages in addition to the unpaid wage that was withheld absent a bona fide dispute").

Ms. Mazengo worked for the Defendants sixteen hours per day, seven days per week and therefore should be compensated for eight hours per day at a rate of $5.15 per hour and eight hours per day at a rate of $7.73 per hour for each day that she spent in the Mzengis' house. Based on these figures and the duration of employment (June 28, 2000 through August 18, 2004), expert witness Gary Ray constructed the following table of Ms. Mazengo's earnings under, *inter alia*, the Maryland minimum wage statute:

| 2000 | 2001 | 2002 | 2003 | 2004 | TOTAL |
|------|------|------|------|------|-------|
| $20,845.84 | $41,059.98 | $41,059.98 | $41,059.98 | $26.056.29 | $170,083.07 |

(Pl.'s Ex. 3 ¶ 7.) Multiplied by a factor of three to reflect the statute's provision of treble damages, the undersigned recommends that the trial court award Ms. Mazengo compensatory damages in the amount of $510, 249.21 under the Maryland Wage and Hour Law.

B.    Damages for the Value of Plaintiff's Services

In addition to statutory damages, Plaintiff is entitled to recover the value of the services that she provided to Defendants to the extent that the value of her services exceeds the damage

award to which she is entitled under the Wage and Hour Law. In other words, Plaintiff "is

entitled to recover not only the minimum wages to be awarded as a matter of law, but also

additional wages the Mzengis would have had to pay to obtain her services on the labor market."

(Pl.'s Pre-Trial Br. at 14.)

Plaintiff may recover additional damages for the value of her services under a theory of

unjust enrichment.[5]   Under Maryland law,

> [a] claim of unjust enrichment is established when: (1) the plaintiff confers a
> benefit upon the defendant; (2) the defendant knows or appreciates the benefit;
> and (3) the defendant's acceptance or retention of the benefit under the
> circumstances is such that it would be inequitable to allow the defendant to retain
> the benefit without the paying of value in return.

*Benson v. State*, 887 A.2d 525, 546 (Md. 2005) (citing *Caroline County v. Dashiell*, 747 A.2d

600, 607 n.6 (Md. 2000)).  The proper remedy for "unjust enrichment is not compensatory

damages but restitution - the disgorgement of the benefits that it would be unjust for the

defendant to keep."  *Boyd v. Bell Atlantic - Maryland, Inc.*, 887 A.2d 637, 650 (Md. 2005).

A claim for restitution damages based on a theory of unjust enrichment is similar to a

claim in *quantum meruit* in that both involve the plaintiff's provision of services to the

---

[5] Plaintiff also argues that she is entitled to the prevailing wage for her services pursuant to the trafficking and forced labor provisions of the Trafficking Victims Protection Act of 2000 (TVPA), 18 U.S.C. §§ 1589 (forced labor), 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor).  Although the TVPA established criminal penalties when it was enacted in 2000, it did not provide for a private right of action until the statute was amended in 2003.  *See* 18 U.S.C. § 1595 (2003) ("An individual who is a victim of a violation of section 1589, 1590, or 1591 of this chapter may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.").  Section 1595 does not expressly provide for retroactive application and the Supreme Court has cautioned that in the absence of a "clear congressional intent authorizing retroactivity . . . prospectivity remains the appropriate default rule."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 272 (1994).  The act of trafficking in this case occurred when Defendants brought Plaintiff to the United States in 2000 and the acts of forced labor occurred between 2000 and 2004.  (Compl. ¶ 7.) Therefore in the absence of clear language indicating that the private right of action in § 1595 can be applied retroactively, the TVPA does not provide Plaintiff with a basis for recovering the prevailing value of her services for most of the period that she worked for Defendants.  As a result, unjust enrichment - rather than the TVPA - provides Plaintiff with the strongest basis for recovering these additional damages.

9

defendant. *See Alternatives Unlimited, Inc. v. New Baltimore City Bd. of School Comm'rs*, 843 A.2d 252, 288 (Md. 2004). A plaintiff may recover in *quantum meruit* "for the value of the services, measuring value in the labor market where the service itself was sought by the defendant." *Id*. If the Mzengis are only required to pay Ms. Mazengo the statutory minimum wage for the services she performed, the Mzengis would be unjustly enriched insomuch as the cost of obtaining similar services in the labor market exceeds the statutory minimum wage. Therefore Ms. Mazengo may recover the fair market value of the services that she performed for the Mzengis' benefit, but only to the extent that the value of those services exceeds the minimum wage that an employer would have to pay for those services under Maryland law.

Gary Ray of the State of Utah, Department of Technology Services testified about the value of the services that Ms. Mazengo provided to the Mzengis. Mr. Ray used the National Prevailing Wage Database to determine the prevailing wage for an entry level house worker in the metropolitan area that encompasses Montgomery County, Maryland. (Pl.'s Ex. 3 ¶¶ 6, 8.) Mr. Ray provided the prevailing wage for the applicable job classification and geographic area for each of the years in question and calculated the total wage to which Ms. Mazengo would be entitled. His calculations are based on a 115.5 hour work week, with forty hours compensated at the prevailing wage and seventy-five and one-half hours compensated at time-and-a-half. (*Id*. ¶ 7.)

| Year | Prevailing Wage | Total Wages |
|------|-----------------|-------------|
| 2000 | $6.43 | $26,014.49 |
| 2001 | $6.50 | $51,798.50 |
| 2002 | $6.26 | $49,885.94 |
| 2003 | $6.72 | $53,551.68 |

10

| 2004 | $6.71 | $33,934.15 |
|---|---|---|
| | | **TOTAL = $215,184.76** |

(*Id.* ¶¶ 6, 7.)  Based on Mr. Ray's testimony, the undersigned recommends that the trial court

award an additional $45,101.69, representing the difference between the prevailing wage and the

minimum wage to which Ms. Mazengo should receive under the Maryland Wage and Hour Law.


      C.     Damages for Fraudulent Inducement

     Plaintiff is also entitled to recover damages for losses that she suffered as a result of the

Mzengis' conduct on a theory of fraudulent inducement or fraudulent misrepresentation.  The

Court of Special Appeals of Maryland defined the term "fraudulent inducement" as a situation in

which "one has been led by another's guile, surreptitiousness or other form of deceit to enter into

an agreement to his detriment."  *Sec. Constr. Co. v. Maietta*, 334 A.2d 133, 136 (Md. Ct. Spec.

App. 1975).  The elements of this tort are that:

> (1) the defendant made a false representation to the plaintiff, (2) the falsity of the
> representation was either known to the defendant or the representation was made
> with reckless indifference to its truth, (3) the misrepresentation was made for the
> purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation
> and had the right to rely on it, and (5) the plaintiff suffered compensable injury as
> a result of the misrepresentation.

*Hoffman v. Stamper*, 867 A.2d 276, 292 (Md. 2005).  Because the Mzengis' liability for

fraudulent inducement has been established by the allegations in the Complaint, the remaining

issue is the measure of damages to which Ms. Mazengo is entitled.

     Two provisions of the Restatement (Second) of Torts guide the undersigned in awarding

Plaintiff damages for Defendants' fraudulent misrepresentations.  First, § 525 states:

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law

11

for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

RESTATEMENT (SECOND) OF TORTS § 525 (1979).  Second, § 932 provides, in relevant part: "If one is entitled to a judgment against another because the other has tortiously caused him to render services, the damages include compensation for . . . (b) other elements of harm of which the other's conduct was the legal cause."  RESTATEMENT (SECOND) OF TORTS § 932 (1979).  The Comment to this section explains that a person who "has been defrauded into working" may "recover for any harm arising from risk in excess of that of which he had knowledge" and "for any other items of harm legally caused by the wrongful act."  *Id*. cmt. b.

Based on this theory, Ms. Mazengo should recover the measure of Social Security and Medicare taxes that the Mzengis were obligated to pay on her behalf under the terms of the employment contract.  According to Mr. Ray, the Mzengis should have paid $13,341.46 in Social Security taxes and $3,120.18 in Medicare taxes for a total of $16,461.64.  (Tr. at 54.)  Ms. Mazengo should also recover an additional $3,500, representing the cost of a one-way return airline ticket to Tanzania.  (Tr. at 39.)  The employment contract indicated that the Mzengis would "bear all the costs of [Ms. Mazengo's] travel . . . from Washington to Dar-es-Salaam at the termination of this contract."  (Pl.'s Ex. 1 ¶ 7.)  Although the Mzengis provided Ms. Mazengo with a return ticket after her sister's death, she was not prepared to return to Tanzania until she had collected her unpaid wages.  (Compl. ¶ 67-68.)  Ms. Mazengo indicated that she wishes to return to Tanzania when this matter is concluded and when she feels safe to return home, and the undersigned believes that the Mzengis should bear the cost of that journey.  Accordingly, the undersigned recommends that the trial court award Ms. Mazengo $19,961.64 in

damages for fraudulent inducement.

D.    <u>Damages for Emotional Distress</u>

Plaintiff's recovery is not limited to pecuniary loss; rather, she may also recover for both physical and emotional injuries. *See* RESTATEMENT (SECOND) OF TORTS § 905 (1979) ("Compensatory damages that may be awarded without proof of pecuniary loss include compensation (a) for bodily harm, and (b) for emotional distress."). While Maryland courts have rejected negligent infliction of emotional distress as a separate tort, they recognize that "recovery may be had in a tort action for emotional distress arising out of negligent conduct." *Walser v. Resthaven Mem'l Gardens, Inc.*, 633 A.2d 466, 472-73 (Md. Ct. Spec. App. 1993) (quoting *Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1066 (Md. Ct. Spec. App. 1986)). As defined in the Restatement, "negligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm." RESTATEMENT (SECOND) OF TORTS § 282 (1979). Through her allegations in the Complaint and testimony at the hearing, Ms. Mazengo established that the Mzengis acted negligently by, among other things, forcing her to work more that sixteen hours per day, isolating her from the outside world, and subjecting her to threats of deportation and physical harm. (Compl. ¶ 127; Tr. at 18-19, 23, 28.) Therefore the only remaining issues are (1) whether Maryland law allows Ms. Mazengi to recover for the non-pecuniary damages that flowed from the Mzengis' negligent conduct and (2) what the measure of those emotional distress damages should be.

Under the *Bowman* rule, set forth in the leading Maryland case on recovery of emotional distress damages, *Bowman v. Williams*, 165 A. 182 (Md. 1933), there must be some "physical

injury" that results from the emotional distress for the plaintiff to recover damages. *Vance v. Vance*, 408 A.2d 728, 733 (Md. 1979). However, the term "physical" is not to be interpreted in its "ordinary dictionary sense;" rather, "it is used to represent that the injury for which recovery is sought is capable of objective determination." *Id*. at 733-34. Injuries that courts have labeled "physical" include: depression, loss of appetite, insomnia, loss of weight, inability to perform household chores, extreme nervousness, and irritability. *Id*. at 734 (citations omitted). Ms. Mazengo suffered various physical and emotional injuries as a result of her time working for the Mzengis including inability to eat or sleep, headaches, and inability to work, cook, or take care of herself. (Tr. at 36-37.) Accordingly the undersigned finds that she has suffered the requisite physical injuries to recover damages for emotional distress.

In determining the measure of recovery for non-pecuniary harms, the court should examine the duration and intensity of the emotional distress, which in turn requires that the court consider "all relevant circumstances . . ., including sex, age condition in life and any other fact indicating susceptibility of the injured person to [the] type of harm." *Id*. cmt. i. When the Mzengis brought Ms. Mazengo to the United States, she was twenty years old, did not speak English and had never traveled outside of Tanzania. (Compl. ¶ 11, 14, 17-18.) Mr. Mzengi, as an official with the Tanzanian embassy in Washington, D.C., was in a unique position to bring Ms. Mazengo to the United States under a special visa reserved for domestic employees of diplomats. (Tr. at 8.) The Mzengis isolated Ms. Mazengo in their home, would not give her telephone calling cards to contact her family, and did not teach her how to use public transportation. (Tr. at 28-29, 33.) These factors clearly support awarding Ms. Mazengo damages for the emotional harms that she suffered during the four years that she was a prisoner in the

14

Mzengis' home.  Accordingly, the undersigned recommends that the trial court award Ms.

Mazengo $250,000 for her physical and emotional injuries.


     E.    Punitive Damages

    Ms. Mazengo is entitled to punitive damages under Maryland law.  Punitive damages are

available when a plaintiff establishes by clear and convincing evidence "that the defendant's

conduct was characterized by an evil motive, intent to injure, ill will, or fraud, *i.e.*, 'actual

malice.'" *Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633, 652 (Md. 1992).  With respect to fraud

claims, such as Ms. Mazengo's claim for fraudulent inducement, "a person's actual knowledge

that his statement is false, coupled with his intent to deceive another by means of that statement,

constitute the 'actual malice' required" under *Zenobia*.  *Ellerin v. Fairfax Sav., F.S.B*, 652 A.2d

1117, 1129 (Md. 1995).  A punitive damage award should be proportional to "the heinous nature

of the defendant's tortious conduct."  *Zenobia*, 601 A.2d at 649.  Awarding damages that are

proportional the defendant's conduct furthers the twin "historical purposes of punitive damages -

punishment and deterrence."  *Id*.

    The Mzengis lured Ms. Mazengo to this country with a bounty of promises about eight

hour days, vacation time and medical care.  (*See* Pl.'s Ex. 1.)  As soon as Ms. Mazengo stepped

off the airplane from Tanzania, Mr. Mzengi seized her passport, her employment contract, and

her hopes of obtaining what was promised to her in the contract.  (Compl. ¶ 58; Tr. at 16.)  There

is no evidence that the Mzengis ever intended to honor the statements made in the contract or

that they believed those statements were true.  Therefore the undersigned finds that Ms. Mazengo

has established by clear and convincing evidence that the Mzengis acted with actual malice and

further finds that an award of punitive damages in this case would be proportional to the heinousness of the Mzengis' conduct and consistent with the aims that punitive damages further. Accordingly the undersigned recommends that the trial court award her $150,000 in punitive damages.

F.     Attorneys' Fees and Costs

Under the Wage Payment and Collection Law, if a court finds that the employer withheld the wages "not as a result of a bona fide dispute, the court may award the employee . . . reasonable counsel fees and other costs" in addition to the unpaid wages. MD. CODE ANN., LAB. & EMPL. § 3-507.1(b). *See also* § 3-427(d). In an action based on diversity jurisdiction, "a federal court will apply state law with regard to the allowance of attorney's fees." *Glassman Constr. Co. v. Md. City Plaza, Inc.*, 371 F.Supp. 1154, 1162 (D. Md. 1974). As to the calculation of attorneys' fees under Maryland law, the Court of Appeals of Maryland has held that the lodestar method is the "presumptively appropriate methodology to be used under the Wage and Hour Law and the Payment Law." *Friolo v. Frankel*, 819 A.2d 354, 371 (Md. 2003). This method of calculating fees involves multiplying the number of hours the attorney reasonably expended on the litigation by the attorney's reasonable hourly rate. *Id*. at 367 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). When determining the reasonableness of a fee award, a court should consider the factors set forth in Rule 1.5 of the Maryland Rules of Professional Conduct[6] and is not bound by any "matrix"[7] that has been adopted by other jurisdictions. *Id*. at

---

[6] Rule 1.5 provides:

A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness

16

370.

Counsel for Ms. Mazengo submitted affidavits that detail the number of hours that each member of the litigation team spent on this case and the hourly rate that each person charges for his or her services.  (Aff. of Counsel Fees [21]; Aff. of Counsel Fees [22].)  The information contained in these affidavits can be summarized as follows:

| Name | Hours | Hourly Rate | Total Fees |
|---|---|---|---|
| Martina E. Vandenberg | 80.25 | $425.00 | $34,106.25 |
| Daniel I. Weiner | 75.00 | $300.00 | $22,500.00 |
| Anjan Choudhury | 43.50 | $325.00 | $14,137.50 |
| Lorelie S. Masters | 8.50 | $525.00 | $4,462.50 |
| Elizabeth Keys | 29.50 | $120.00 | $3,540.00 |
| Cheryl L. Olson | 12.75 | $235.00 | $2,996.25 |
| Michael J. Mahoney | 14.00 | $125.00 | $1,750.00 |
| Jason M. Berrus | 2.00 | $125.00 | $250.00 |
| Tricia J. Peavler | 1.00 | $235.00 | $235.00 |
| Stephen S. Mellin | 0.25 | $235.00 | $58.75 |
| | | | TOTAL = $84,036.25 |

of a fee include the following:
  (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
  (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
  (3) the fee customarily charged in the locality for similar legal services;
  (4) the amount involved and the results obtained;
  (5) the time limitations imposed by the client or by the circumstances;
  (6) the nature and length of the professional relationship with the client;
  (7) the experience, reputation, and ability of the lawyer of lawyers performing the services; and
  (8) whether the fee is fixed or contingent.

[7] By using the word "matrix" the Court of Appeals refers to the use of the *Laffey* Matrix, which was created by the United States Attorney's Office for the District of Columbia and which sets forth the prevailing market rates for attorneys of different experience levels.

Having considered the factors set forth in Maryland Rule of Professional Conduct 1.5, the undersigned believes that the number of hours expended and the hourly rates cited in the Affidavits of Counsel Fees are reasonable  Accordingly the undersigned recommends that the trial court award Plaintiff $84,036.25 in attorneys' fees.

Unlike attorneys' fees, the allowance of costs is a procedural matter and therefore state law is not necessarily controlling. *Glassman*, 371 F.Supp at 1162.  In determining whether it should apply a state cost-shifting statute, such as the Wage Payment and Collection Law, rather than Federal Rule of Civil Procedure 54(d)(1)[8], a court should examine whether the state law conflicts with the federal rule. *Garcia v. Wal-Mart Stores, Inc.*, 209 F.3d 1170, 1176-77 (10th Cir. 2000).  Rule 54(d)(1) only allows the prevailing party in litigation to recover the categories of costs enumerated in 28 U.S.C. § 1920[9].  *Id*.  To the contrary, the Wage Payment and Collection Law allows a prevailing plaintiff to recover the full amount of costs that she incurred. *Imgarten v. Bellboy Corp.*, 383 F.Supp.2d 825, 837 (D. Md. 2005).  In *Garcia*, the United States Court of Appeals for the Tenth Circuit held that a Colorado statute that provided for an award of "actual costs" was not preempted by Rule 54(d).  *Garcia*, 209 F.3d at 1178-79.  Moreover, the

---

[8] Rule 54(d)(1) provides, in relevant part: "Unless a federal statute, these rules, or a court order provides otherwise, costs – other than attorney's fees – should be allowed to the prevailing party."

[9] 28 U.S.C. § 1920 provides:

> A judge or clerk of any court of the United States may tax as costs the following:
>> (1) Fees of the clerk and marshal;
>> (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
>> (3) Fees and disbursements for printing and witnesses;
>> (4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
>> (5) Docket fees under section 1923 of this title;
>> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.
> A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

Tenth Circuit noted that public policy concerns - namely the prevention of forum shopping and the "inequitable administration of the laws"- supported their holding because "[i]f federal courts did not employ the Colorado cost-shifting statute, that could substantially alter the amount of money an unsuccessful defendant would have to pay a successful plaintiff - a significant difference in outcome between the state and the federal courts." *Id*. at 1177.  Because the Maryland cost-shifting provision and Rule 54(d)(1) do not conflict, and because the public policy concerns raised in *Garcia* support the application of the Maryland statute instead of the federal rule, the undersigned concludes that the Wage Payment and Collection Law governs the calculation of fees to which Ms. Mazengo is entitled.  However, because Ms. Mazengo has not submitted any documentation of the costs incurred in prosecuting this case, the undersigned has no basis for making a recommendation about the amount of costs that the trial court should award.

III.    **CONCLUSIONS**

    For the foregoing reasons, the undersigned recommends that the trial court award Ms. Mazengo damages and attorneys' fees in the amount of **$1,059,348.79**, which should be allocated in the following manner:

    **$510,249.21** in treble damages under the Maryland Wage and Hour Law;

    **$45,101.69** in compensatory damages for unjust enrichment;

    **$19,961.64** in compensatory damages for fraudulent inducement;

    **$250,000.00** in compensatory damages for emotional distress;

    **$150,000.00** in punitive damages; and

**$84,036.25** in attorney's fees.


IV.     **REVIEW BY THE DISTRICT COURT**

The parties are hereby advised that under the provisions of Local Rule 72.3 (b) of the

United States District Court for the District of Columbia, any party who objects to the Report and

Recommendation must file a written objection thereto with the Clerk of this Court within 10 days

of the party's receipt of this Report and Recommendation.  The written objections must

specifically identify the portion of the report and/or recommendation to which objection is made,

and the basis for such objections.  The parties are further advised that failure to file timely

objections to the findings and recommendations set forth in this report may waive their right of

appeal from an order of the District Court that adopts such findings and recommendation.  *See*

*Thomas v. Arn*, 474 U.S. 140 (1985).  If this Report and Recommendation is served on the parties

by mail, calculation of the time period for filing written objections is as follows: 10 business days

(excluding weekends and holidays) plus three calendar days (including weekends and holidays).

*See CNPq-Conselho Nacional De Desenvolvimento Cientifico E Technologico v. Inter-Trade,*

*Inc.*, 50 F.3d 56, 58 (D.C. Cir. 1995) (per curium).



Dated: December  20 , 2007                    _____/s/_____
                                                                ALAN KAY
                                                                UNITED STATES MAGISTRATE JUDGE

20